# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT KNOXVILLE

| | |
|---|---|
| **ANDREW JOSTEN LOVINGOOD,** )<br> **Plaintiff,** )<br> )<br>**vs.** )<br> )<br> )<br> )<br>**BILL JOHNSON, DERRICK** )<br>**GRAVES,** and **MONROE COUNTY,** )<br>**TENNESSEE,** )<br> **Defendant.** ) | **No.: 3:19-CV-009** |

## PLAINTIFF'S RESPONSE AND INCORPORATED MEMORANDUM OF LAW TO DEFENDANT MONROE COUNTY, TENNESSEE'S MOTION FOR SUMMARY JUDGMENT

**COMES NOW**, Plaintiff Andrew Josten Lovingood, by and through his undersigned attorneys and files this his Response and Incorporated Memorandum of Law to Defendant Monroe County, Tennessee's Motion for Summary Judgment as follows:

1.     Plaintiff sued Defendants Bill Johnson and Derrick Graves individually and in their official capacities.

2.     Plaintiff sued Defendant Monroe County, Tennessee for its failure to properly screen before hiring the Defendants Johnson and Graves, and for the failure to properly supervise those Defendants once they were hired, and for the failure to train them once hired. [Doc. 1, ¶'s 49 through 53]. Plaintiff further alleged that Defendant Monroe County, Tennessee refused to discipline the Defendant Deputies for their illegal actions against Plaintiff. [Doc. 1, ¶'s 49 through 59] Such failure constituted a ratification of the unconstitutional conduct by the County.

3.     The individual Defendants, only, were sued for their excessive use of force. [Doc. 1, ¶'s 30 and 48] However, T.C.A. § 8-8-302 makes the County financially liable for the non-negligent acts of deputies appointed by the Sheriff when acting by virtue of or under color of their office and the County has statutorily waived its immunity for such actions under that statute.

4.     "The Sixth Circuit has consistently held that blows to the face and body of a restrained suspect who is no longer a threat to the officers represent an unreasonable use of force. See, e.g., *Harris v. City of Circleville,* 583 F.3d 356, 366–67 (6th Cir.2009); *Champion v. Outlook Nashville, Inc.,* 380 F.3d 893, 902–03 (6th Cir.2004); *Phelps v. Coy,* 286 F.3d 295, 301–02 (6th Cir.2002)." *Kellam v Hembree*, 2014 WL 1304322, at p. 5 (E.D.Mich. Mar. 31, 2014). However, in this case, the videotapes at the Jail clearly show the Defendants Johnson and Graves along with other Jail personnel and Sheriff deputies were hitting and kicking Plaintiff who was in handcuffs and leg restraints and therefore posed no threat to anyone. See Exhibits A, B, and C respectively, Monroe County Jail Surveillance Videos from Camera designated as Camera 07 at approximately 12:39:00; Camera CH 3, 4/19/2014 1330.avi starting at 13:38:10; Camera 08-20140419-191101 starting at 12:40:00. These actions by Defendants Johnson and Graves and others were observed, and recorded, by other jailers who took no action to protect Plaintiff from the beating he received at the hands of other jailers and deputies.

Given the state of the law for the past decade, the fact that the Defendant Deputies were not disciplined and/or subjected to additional training on this point by the Sheriff's Office until months later after a new Sheriff was elected and took office is strong circumstantial evidence that the Office of the Sheriff condoned the conduct by his deputies and jailers. Only after the "new Administration" assumed control of the Sheriff's

2

Department and Tommy Jones was notified by the Tennessee Bureau of Investigation that indictments of the two deputies were imminent did they review the videotapes, which clearly show Plaintiff being hurled from Defendant Johnson's police cruiser onto the concrete while handcuffed behind his back and while in leg restraints attached to those handcuffs. See Exhibit D, Deposition of Tommy Jones, p. 8, lines 12-25, p. 9, lines 1-7; Exhibit A Monroe County Jail Surveillance Videos designated as Camera 07 at approximately 12:38:15 where Deputy Johnson and Deputy Graves can be seen removing Plaintiff who is handcuffed and has leg restraints on and hurling Plaintiff who was hog-tied at the time from the back seat of the cruiser to the concrete pavement.[1]

Later, the videos depict Defendants Johnson and Graves in the area of the Jail referred to as the "drunk tank" punching Plaintiff, while he is still in leg restraints and handcuffs, in the head, face, body, and kicking/kneeing Plaintiff in full view of multiple other officers who were present, and others who were watching "the action" on the surveillance footage. And yet, not one single sworn officer reported the excessive force being used on a man who was already fully restrained. See Exhibit B, and C, Video Camera CH 3, 4/19/2014 1330.avi; Camera 08-20140419-191101.

5.    The Defendant Monroe County has failed to establish the actual training for each Defendant Deputy for purposes of demonstrating that the training was adequate for constitutional purposes. "Although it is a close question, the Court concludes that, based on the testimony of these two witnesses, a reasonable jury could conclude that Jackson County's training program is inadequate regarding the tasks that its road officers must

---

[1]  It should be noted that the patrol cars of Johnson and Graves parked outside of the sally port instead of pulling into the sally port, which was empty, and having the gate closed behind them. The two cameras that depict the sally port area are able to clearly show what happens in the sally port. This is strong circumstantial evidence that the Defendant Deputies knew that what they were going to do was wrong and that they wanted to avoid their conduct being recorded for posterity.

perform. Other decisions support this conclusion. For example, in *Hockenberry v. Village of Carrollton,* 110 F.Supp.2d 597, 602 (N.D.Ohio 2000), the court held that a jury question existed on the issue of municipal liability because the Village had provided only one training course on its policies and procedures and the officer involved in the incident (a police pursuit that led to a crash) had never been tested on the procedures. And in *Harvey v. Campbell County, Tenn.,* 2008 WL 5429646, *4–*5 (E.D.Tenn. Dec. 30, 2008), the court held that a triable issue existed about the adequacy of a county's training policies where the County's training on the use of deadly force consisted of providing written policies to the officers and relying on their general law enforcement training, which included forty hours of in-service training each year. The court noted that 'without any indication as to the full extent' of the officer's training and without 'specific evidence regarding the nature and extent of his [previous] training,' reasonable minds could differ on whether the training provided was adequate." *Maynard v. Jackson County Ohio*, 706 F.Supp.2d 817, 827 (S.D. Ohio, Eastern Division 2010).

The Affidavit of Sheriff Bivens, does not describe the precise training of each officer; without any specification as to what that training consisted of or whether any of that training was relevant to the constitutional issues in this case. While the policies and procedures manuals for the Sheriff's Patrol Division and Jail Division were attached to the Affidavit of Bivens, there is no reference to either individual officer being provided with such manuals or receiving training in such manuals. [Doc. 44, ¶ 9]. Under *Maynard*, the allegations in the Affidavit are legally insufficient to raise a genuine issue of material fact on the sufficiency of the training so as to shift the burden to the Plaintiff.

6.    Defendant Graves has entered a guilty plea as to the charges arising out of this incident. Graves has admitted in his deposition that he did commit the offenses to

which he entered pleas and that he was never disciplined or even the subject of any investigation into his actions that day. He admitted that he used "knee strikes" on Plaintiff while Plaintiff was in a cell with multiple other officers and while Plaintiff was handcuffed. See Exhibit I Deposition of Graves, p. 70 lines 16-20; p. 74 lines 7-24; and pps. 119-120, lines 10-25 and 1-12.

While it is counter-intuitive that you should have to train a law enforcement officer that it is an unconstitutional use of force to strike a person who is confined or a detainee while they are restrained and no longer a threat to law enforcement, apparently the exact situation as occurred with Plaintiff arises with sufficient frequency that the appellate courts have to periodically weigh in and remind officers, and their departments/employers, that this has been the law of the land for more than a decade in the Sixth Circuit. *Kellam v Hembree*, 2014 WL 1304322, at p. 5 (E.D.Mich. Mar. 31, 2014) and cases cited therein.

7. "The Court of Appeals for the Sixth Circuit has held in at least two decisions that a sheriff's failure to investigate incidents of police abuse and to discipline the officers involved may constitute ratification of the illegal acts and may amount to deliberate indifference to the constitutional rights of the victims of the misconduct. *See Leach v. Shelby County Sheriff,* 891 F.2d 1241, 1248 (6th Cir.1989); *Marchese v. Lucas,* 758 F.2d 181, 188 (6th Cir.1985)." *Maynard v. Jackson County Ohio*, 706 F.Supp.2d 817, 827-828 (S.D. Ohio, Eastern Division 2010).

"In the context of supervisory liability for failure to train asserted against an individual, a plaintiff must demonstrate that the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved,

or knowingly acquiesced in the unconstitutional conduct of the offending officers.' Phillips v. Roane Cnty., Tenn., 534 F.3d 531, 543 (6th Cir. 2008) (citing Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999)). Supervisory liability attaches 'only if a constitutional violation is 'part of a pattern' of misconduct, or 'where there is essentially a complete failure to train the police force, or training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to occur.' ' Ontha v. Rutherford Cnty., Tenn., 222 Fed.Appx. 498, 504 (6th Cir. 2007) (quoting Hays v. Jefferson County, 668 F.2d 869, 874 (6th Cir. 1982))." *Schalk v. City of Memphis Tennessee et al*, 2015 WL 11019255, p. 13 (W.D. Tenn., Western Division, No. 14-cv-2220 SHL-tmp, signed August 13, 2015).

In the case before this Court, Plaintiff has identified numerous instances of the excessive use of force by deputies against persons arrested, or detained at the Monroe County Jail, that were known to Monroe County and the fact that these abuses continued to happen in much the same way was clear notice to Monroe County that the unconstitutional use of force was a part of a pattern of misconduct that continued uncorrected. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)

Here the other cases referenced in the Request for Judicial Notice reveal that the instances of excessive force by the various deputies were ignored. In one case the deputies resigned and Sheriff Bivens hired one of them back notwithstanding the fact that their actions were captured on videotape, and they had entered pleas to the criminal charges. See Exhibit F, Request for Judicial Notice numbers 4 and 8. Deputy Albert Mendina was kept on staff until the second incident of excessive force involving him against a child. See Exhibit F, Request for Judicial Notice number 5. Monroe County has been sued over

repeated incidents of the use of excessive force and yet has willfully failed and refused to address the problem.

Months after this incident with Plaintiff, there was an election and Randy White defeated Sheriff Bivens. However, Sheriff Bivens sued on the grounds that Randy White was not statutorily qualified to assume the Office of the Sheriff because White did not have three full years of full-time law enforcement experience required by T.C.A. § 8-8-102 before being placed on the ballot for office. Following a trial and appeal, the election for the Office of Sheriff was declared void. See Exhibit F, Request for Judicial Notice, number 1, *Bivens v. White, et al*, NO. E2014-02251-COA-R3-CV-Filed-September 16, 2015. The County then appointed Sheriff Tommy Jones to fill the position of Sheriff until an election could be held. However, the appointment of Jones was after the material events, which took place in this case. At the time of the "investigation" and firing of the Defendant Deputies, which took place months after the incident in question, Jones was the Deputy Chief in the Sheriff's Department and Randy White was the duly elected Sheriff. *There was no investigation close in time to the incident by the then-Sheriff and/or the County even though they were made aware of the incident with Plaintiff and even though they knew that the encounters with Plaintiff at the Jail were caught on tape and available for anyone who cared to know what they showed.* Furthermore, Plaintiff's mother had complained directly to the Sheriff when the incident first happened. Exhibit D, Deposition of Tommy Jones, p. 28, lines 3-17; p. 37, lines 13-14 ("They'd spoke to Bivens about it. Bivens hadn't done anything") and 20-24 ("Q. If I heard you correctly in that, Darlene Lovingood told you that she had complained about the incident to Sheriff Bivens; is that correct? A. Yes.); Exhibit G, Deposition of Bill Johnson, p. 13, lines 15-23; p. 68, lines 7-16.

8.     The County is not a person but rather an entity, and therefore acquires notice and knowledge like any other entity or corporation. The testimony of Tommy Jones clearly sets out that there was knowledge within Monroe County, including the Sheriff's Department that the Defendant Deputies had engaged in conduct that crossed a line into unconstitutional conduct. See Exhibit D, Deposition of Tommy Jones, p. 8, lines 12-25, p. 9, lines 9-25, p. 32, lines 24-25; p. 37, lines 20-24.

9.     Prior to this incident, Plaintiff had previously been diagnosed as being bipolar, suffering from depression and anxiety. Exhibit H, Deposition of Andrew Lovingood, p. 51, lines 10-21. He has testified that he was paranoid and trying to get home[2] but the police car was following him so he stopped and asked the officer why the officer was following him. According to the Plaintiff, this made the officer mad and the officer began beating him on the side of the road. Exhibit H, Deposition of Andrew Lovingood, p. 46, lines 1-13. Mr. Lovingood also testified that there were witnesses to the officers beating him, including Renee Reed and her son. Exhibit H, Deposition of Andrew Lovingood, p. 42, lines 4-25. At the time of his initial encounter with Defendant Johnson Plaintiff was in the midst of a mental health crisis and his mental condition continued to deteriorate until he was eventually taken to Moccasin Bend Mental Health. The videotapes from the Monroe County Jail surveillance cameras show a person who is mentally unbalanced. Instead of treating him like a person in crisis, he was handled roughly into the Jail and subsequently put into the drunk tank where he was beaten and kicked and left alone for an extended period of time in handcuffs and leg restraints. See

---

[2]  Plaintiff testified that he had been at the Election Commission earlier that day voting and he had had a panic attack/nervous breakdown there and had to leave. Exhibit H, Deposition of Plaintiff, p. 22, lines 17-25, p. 23, lines 1-22. Tommy Jones testified that Defendant Deputy Johnson had "received a call on Mr. Lovingood" about what had transpired at the Elections Commission and based on that information, Johnson had "initiated a traffic stop". Exhibit D, Deposition of Tommy Jones, p. 11, lines 12-22.

Exhibits A, J, Camera 07 at 12:39:15; Camera 05 at 12:39:15; See Exhibits A, B, C, Monroe County Jail Surveillance Videos from Camera designated at Camera 07 at approximately 12:39:15; Camera CH 3, 4/19/2014 1330.avi; Camera 08-20140419-133736.avi.

10.     There is no evidence in the record that the County supplied training that would have enabled the Defendant Deputies to treat the Plaintiff appropriately during his initial arrest and initial placement in the Jail. Even the current Sheriff acknowledges that tempers flair and sometimes there is an issue with an officer controlling his or her anger where the person being taken to Jail is cursing, rude and/or disrespectful and that changes needed to be made to prevent this precise type of incident. Exhibit D, Deposition of Tommy Jones, p. 13, lines 17-25, p. 14, lines 1-25, p. 15, lines 1-2.

11.     By his own testimony, Defendant Johnson had had no less than eight jobs prior to his most recent hiring by the Monroe County Sheriff's Department. See Exhibit G, Deposition of Johnson, pps. 7-9, lines 22-25, 1-15, 17-25, and 1-13. (He worked at Monroe County, then Tellico City, then Monroe County, they Bivens Oil Company, then Athens City Police Department, Madisonville City Police Department and then back to Monroe County.)

12.     The standard for review, as Defendant Monroe County points out in its Memorandum of Law, requires that Monroe County first carry its burden of showing that there are no genuine issues of material fact set out in the record regarding an essential element of the claim. [Doc. 61, p. 2 of 12]. Unless, and until, Monroe County meets that burden, the burden does not shift to Plaintiff. Here, Defendant Monroe County's Motion relies upon the Affidavit of Sheriff Bivens.

Defendant alleges that the Deputy Defendants "[b]oth filled out applications and no question exists that the county fully complies with Tennessee law prior to employing

the individuals. No facts exist that either Johnson or Graves had any prior issues, or anything in either of the deputies' past that could place the county on notice or would allow the county to predict the alleged use of unreasonable force on Andrew Lovingood." [Doc 61, pps 7-8] However, Defendant Monroe County points to nothing in the record to support those bare, self-serving assertions. Pointing to record evidence is required under Rule 56 (c), *Federal Rules of Civil Procedure*. Defendant has likewise followed the same "formula" in reference to its assertion that there is no evidence that the supervision of the Defendants Johnson and Graves failed and was the cause of the constitutional violation by those officers. This is all the more critical because counsel for Plaintiff had requested those documents prior to the deposition of Jones.

Defendant Monroe County attempts in its Memorandum of Law to establish that the Deputy Defendants were properly trained. However, *Maynard*, supra, and the cases cited therein hold that this "testimony" or "evidence" is legally insufficient to raise the issue to an undisputed material fact which would then shift the burden to Plaintiff. [Doc. 61, p. 10] Rule 56 (c)(4), *Federal Rules of Civil Procedure*, requires that the Affidavit "be made on personal knowledge and set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify to the matters stated." A review of the Affidavit shows that it does not meet this test.

It must be pointed out that the testimony by Jones clearly establishes that Jones and Randy White, the then-Sheriff, both had personal knowledge of the events that had taken place long before either of them assumed office. See Exhibit D, Deposition of Tommy Jones, p. 8, lines 12-25; p. 32, lines 24-25.

Both Jones and Johnson testified in deposition that to their knowledge, Sheriff Bivens' Administration had never conducted an investigation of any sort into the

allegations regarding the treatment of Plaintiff during his arrest and incarceration, despite the fact that the Plaintiff's mother had specifically complained to the Sheriff about the incident. Exhibit D, Deposition of Tommy Jones, p. 28, lines 3-17; p. 37, lines 13-14 (They'd spoke to Bivens about it. Bivens hadn't done anything") and 20-24 ("Q. If I heard you correctly in that, Darlene Lovingood told you that she had complained about the incident to Sheriff Bivens; is that correct? A. Yes.); Exhibit G, Deposition of Bill Johnson, p. 13, lines 15-23; p. 68, lines 7-16. This testimony makes it clear that the O*ffice of the Sheriff of Monroe County* had knowledge of the incident, and the injuries to the Plaintiff, soon after the events occurred and yet nothing had been done about it.

13. It should be remembered that throughout the Deposition of Sheriff Jones, counsel for Plaintiff made repeated requests for documents that should have been produced to Plaintiff in discovery but weren't. While Counsel for the County advised on the record that he thought the documents had already been produced, no such production ever occurred, including Personnel Files, Internal Affairs Investigations, and Discipline Records. See Exhibit D, Deposition of Tommy Jones, p. 17-18, lines 18-25, 1-18; p. 24, lines 6-22; p. 28, lines 8-17. Additionally, then Sheriff Jones has freely testified that documents were missing when his Administration took over. See Exhibit D, Deposition of Tommy Jones, p. 29, lines 2-15, p. 30, line 1; p. 32, lines 15-23. Without knowing exactly what was missing, there is no way to determine if the personnel files Randy White claimed to have reviewed actually constitute official business records of Monroe County, and Defendant Monroe County cannot establish a proper predicate for the admission of those records as an exception to the hearsay rule in light of the testimony of Tommy Jones. Since The Sheriff has acknowledged that there are some records missing, and he was aware that the records were incomplete when he took office, it would seem that no proper

foundation for the admission of the hearsay testimony in the Randy White Affidavit can be established. Rule 803 (6) and (8), *Federal Rules of Evidence*, and Rule 803 (6) and (8), *Tennessee Rules of Evidence*. See also Rule 902(4), *Tennessee Rules of Evidence*. "The touchstone for admission of evidence as an exception to the hearsay rule has been the existence of circumstances which attest to its trustworthiness." *U.S. v. Williams*, 571 F.2d 344, 350 (6th Cir. 1978) cert. denied, 439 U.S. 841 (1978). The circumstances that exist in this case cannot establish the requisite degree of trustworthiness where Sheriff Jones admits that there are records missing from the Sheriff's Department. See Exhibit D, Deposition of Jones, p. 29, lines 2-25, p. 30, line 1.

14.     Of equal interest is the fact that prior to Plaintiff's arrest and incarceration, there had been at least five separate incidents of excessive force by deputies against persons being taken into custody or already in custody in the Monroe County Jail:

a.  In a similar case, two "road deputies" were called to the Jail and pepper sprayed inmate Randall "Randy" Carter who was in a restraint chair in a cell where he posed absolutely no danger to anyone. Those two deputies, Deputy John Wilburn and Deputy Thomas Darian, were captured on video surveillance at the Jail exercising this unconstitutional use of force and almost immediately resigned and were prosecuted. They entered pleas of guilty and received diversion. Inexplicably Monroe County rehired Deputy John Wilburn. See Request for Judicial Notice, numbers 4, 8, and 9.

b.  A school resource officer, Albert Mendina, dragged a female juvenile into the Jail, handcuffed her to a chair and left her there with adults. See Request for Judicial Notice, 6, 7.

c.     Shockingly Albert Mendina was still employed by the Monroe County Sheriff's Department as a school resource officer when he subsequently dragged a special

needs student into an office and restrained the student by means of a choke hold that was so tight it left a perfect impression of the officer's badge on the child's skin. See Request for Judicial Notice number 5.

d.    Inmate Joshua Crowder was tasered by then-Jail Administrator, Trent Prock, as Crowder lay on his bunk in his cell posing no threat to anyone.

e.    In yet another incident that is eerily similar to the facts of this case, Deputy Sonny Smart, a "road deputy", cold-cocked/sucker punched an inmate, Justin Bell, in the booking area of the Jail. The incident was, again, caught on the jail surveillance system. The inmate's attorney made a complaint to then-Sheriff Bivens who agreed to arrange to have the inmate's charges reduced with no civil suit being filed against the Deputy or the County. Deputy Smart was not disciplined or fired as a result of this incident.

Efforts to locate the inmates or transcripts from proceedings or documentation from the Sheriff's Department relating to the encounters set forth above are continuing. However, Sheriff Jones has testified that the then previous Administration (Sheriff Bivens) had removed documents from the official records of the Sheriff's Department. See Exhibit D, Deposition of Tommy Jones, p. 29, lines 2-25, p. 30, line 1. Counsel for Plaintiff has been advised that a witness who no longer works for the Sheriff's Department was actually instructed by Sheriff Bivens to "sanitize" the files before the new Administration took over. Counsel for Plaintiff has also been advised that while the official documents may have been removed, or the files sanitized of damning documents and information, a witness who was working for the Monroe County Jail at all times relevant to the incidents set out above was in the habit of preparing "CYA" memoranda and providing a copy to the Sheriff and retaining a copy so that there would be no question about incidents that had

happened in the Jail. Counsel for Plaintiff is in the process of attempting to obtain Affidavits from these two witnesses and pursuant to Rule 56 (d), Federal Rules of Procedure, requests that this Court either: defer ruling on the Motion for Summary Judgment; deny the Motion for Summary Judgment; allow counsel for Plaintiff time to obtain the necessary affidavits or take the depositions of the witnesses to secure the necessary testimony; or such other relief as this Court may deem just and appropriate under the circumstances.

**ARGUMENT AND CITATION OF AUTHORITY**

What is before this Court at this time is Defendant Monroe County's Motion for Summary Judgment predicated on the claim that this Defendant did not know that the training and supervision of the deputies in the Sheriff's Department was not sufficient to prevent constitutional violations by deputies and that Monroe County did properly screen deputies that were hired/appointed to work at the Jail and as road deputies for the Monroe County Sheriff's Department.

**I.     FAILURE TO TRAIN/SUPERVISE**

Where the failure to train amounts to deliberate indifference to the rights of persons with whom the law enforcement officers come into contact, the inadequacy of that training may form the basis for liability under 42 U.S.C. § 1983. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). To demonstrate that, Plaintiff must show prior instances of similar unconstitutional conduct which demonstrates that the governmental entity has "ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury" (*Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005) such that the need for additional training and/or supervision was so obvious that the failure to provide it can be deemed proof that the policymakers were

deliberately indifferent to the need for such training or supervision. *Moldowan v. City of Warren*, 578 F.3d 351, 393 (6th Cir. 2009), cert. denied, 130 S.Ct. 3504 (2010).

Here, Plaintiff has been made aware of at least five (5) prior instances of similar unconstitutional use of force by deputies. In one of the five instances, the deputy was fired and then rehired (John Wilburn), and in a second the deputy (Albert Mendina) was not only not fired, but he remained on the force assigned as a school resource officer only to re-offend. Plaintiff has located documents which are the subject of his Request for Judicial Notice.

What these prior instances demonstrate, though, is that Monroe County was well aware of the fact that deputies in its employ were engaging in unconstitutional use of force and yet there was no change in the policies as it relates to training and supervision. *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005).

The unconstitutional use of force in this case comes in three separate and distinct instances according to the testimony and the videotapes of the encounter between Plaintiff and Monroe County deputies on the date in question:

A.     Original stop during which Plaintiff was beaten, tasered, and "hog-tied" before being placed in Defendant Johnson's cruiser (there is inexplicably no video from the dash camera showing these events) Exhibit G, Deposition of Johnson, p. 53, lines 1-25; p. 55, lines 1-25, p. 56, line 1;

B.     Arrival at the Jail where Johnson parked outside the sally port and Deputy Parks who is Johnson's step-brother assisted him in hurling Plaintiff who was still in handcuffs and leg restraints out of the car and onto the concrete pavement; See Exhibit A, video Camera 07 at 12:39:15; and

C.      The beating that Johnson and Graves subjected Plaintiff to inside the "drunk tank". See Exhibit B, Video CH 3 4/19/2014 1330.avi.

Taking these instances in order, the testimony of Defendant Graves shows that at the time that Plaintiff was beaten and tasered by him and by Johnson, the Plaintiff was on the ground being held down. See Exhibit I, Deposition of Graves, p. 94, lines 17-25. Graves subsequently admitted that he also used a "compliance" technique on Lovingood referred to as the "iron wrist lock" which uses pain to force compliance. Deposition of Graves, p. 98, lines 15-22, p. 99, lines 2-17. The fact that the cruiser was apparently equipped with a dashboard camera that would have recorded the events described yet there is no such video must raise the presumption that the tape recording of the events was deliberately discarded or destroyed or that Deputy Johnson intentionally chose not to activate the recording device. Apparently Deputy Johnson, in his criminal case, moved to dismiss all charges against him on the grounds that Monroe County has intentionally destroyed the evidence. Request for Judicial Notice of State v. Johnson, Monroe County Circuit Criminal Count, Docket Number: 15-140 CRM. The evidence could only be "destroyed" if it existed. Monroe County has claimed that no such evidence existed. Exhibit D, Deposition of Tommy Jones, p. 15, lines 4-15. Deposition of Johnson, p. 53, lines 1-25; p. 54, lines 1-23. Defendant Johnson acknowledged that Plaintiff had told him that Plaintiff needed help during the original contact. Exhibit G, Deposition of Bill Johnson, p. 45, lines 3-6.

Despite Johnson's denials in his deposition as to his reasons for stopping Plaintiff, Johnson told Tommy Jones that he had gotten a call about Plaintiff's conduct at the Election Commission earlier that day. Exhibit D, Deposition of Tommy Jones, p. 11, lines 12-22. (Q. What did Bill Johnson tell you as to what happened?.....A. Is that he'd received

a call on Mr. Lovingood he had initiated a traffic stop on Niles Ferry, right off Highway 411.") Bill Johnson's wife was a dispatcher for the Sheriff's Department. Exhibit G, Deposition of Johnson, p. 33, lines 16-22. So at the time of the initial encounter by Johnson of Plaintiff, Johnson knew that Plaintiff had had some sort of melt-down or mental episode earlier that morning while attempting to vote at the Election Commission.

As to the second incident, after loading Plaintiff into the cruiser, he was driven to the Monroe County Jail. The videos of the arrival of the patrol car at the sally port reveal that both cruisers parked outside the sally port rather than pulling in and closing the gate behind them. See Exhibit A, Video Front Camera 07-20140419-133020.avi. It is curious because pulling into the sally port and closing the gate behind the cruiser would have been the safest way to deal with a combative prisoner, but if you were going to "tune up" the prisoner before taking him into the Jail as the deputies did, parking outside the gate put the cruiser further away from the video cameras. Notwithstanding that, the video shows Johnson and the other patrol officer opening the back door of Johnson's cruiser, reaching in and grabbing Plaintiff who was hog-tied and in a ball, and then violently hurling Plaintiff from the back seat onto the concrete pavement. Exhibit A. Such force was not only unnecessary, it was gratuitous violence which has been condemned by the Sixth Circuit. *Miller v. Sanilac County*, 606 F.3d 240, 252-253 (2010).

The other five cases to which Plaintiff has pointed in his Request for Judicial Notice, reflect similar incidents of gratuitous violence:

1. In 2012, deputies Wilburn and Goodman pepper-sprayed an inmate, Randall Carter, in the jail who was not only strapped into a restraint chair, he was inside a cell at the Monroe County Jail at the time. They resigned, were criminally charged, pled

to the charges and received diversion, and then Wilburn was rehired by the Monroe County Sheriff's Department.

2.      Josh Crowder, an inmate, was tasered by then-Jail Administrator Trent Prock, while Crowder was sleeping in his bed in the Monroe County Jail.

3.      Deputy Sonny Smart sucker punched an inmate named Justin Bell  in the face while at the Jail.

4.      School Resource Officer Albert Medina not only shackled a child to a chair at the Monroe County Jail *and was not fired for it*, he subsequently put a special needs child in a choke-hold so tight that the badge on his uniform left a perfect impression on the skin of the child which was documented with photographs. (Apparently after the second incident, Monroe County and Deputy Medina parted ways.)

Several of these cases resulted in lawsuits that included Monroe County as a defendant so the County cannot claim it was ignorant of the issues relating to excessive force claims within the Sheriff's Department. In fact, Tommy Jones testified that once he took over the Department, he made a change to the procedures where "road deputies" *were not to enter the Jail*; instead they were to pull into the sally port and the jailers/deputies assigned to the Jail would come out and remove the prisoner from the cruiser and escort the prisoner into the Jail. Exhibit D, Deposition of Jones, p. 13-14, lines 8-25, 1-2 ("That just helps keep tempers down.") Plainly there was no training, or insufficient training, for the "road deputies", to prevent road deputies from unleashing their tempers on prisoners once they were taken into custody resulting in the unconstitutional use of force, and the County was well aware of that.

Finally, the third instance of the unconstitutional use of force shows that Plaintiff was in the drunk tank, his feet shackled and those shackles then attached to the handcuffs

he was wearing. See Exhibit F, Request for Judicial Notice, numbers 2 and 3. The videos show that the officers repeatedly punched and kicked Plaintiff. Defendants Johnson and Graves were criminally charged for their conduct as depicted in the videos. Graves has already entered a plea of guilty and received diversion from the court. See Exhibit F, Request for Judicial Notice number 3. While this conduct led to the firing of Defendants Johnson and Graves, that firing did not occur for months after the actual conduct. See Exhibit I, Deposition of Graves, p. 74, lines 7-24. The videos depicting this violence on Plaintiff were available to anyone within Monroe County who cared to inquire into the use of force; Plaintiff's mother complained to Sheriff Bivens within days of the incident (Exhibit D, Deposition of Tommy Jones, p. 37, lines 20-24); and the County had been abuzz with talk about the incident in which Plaintiff was beaten up and tasered by the Monroe County deputies. See Exhibit D, Deposition of Tommy Jones, p. 8, lines 12-25, p. 32, lines 24-25. In short, the use of excessive force on Plaintiff was common knowledge within Monroe County long before the Defendant deputies were fired.

Tommy Jones testified in deposition that he never asked Sheriff Bivens why Bivens had tolerated the actions of Johnson and Graves for so long and he said that he didn't talk to Bivens a lot and "he probably wouldn't speak to me or answer my question if I did." Translation: Jones never asked why Bivens kept the two deputies on staff knowing what they had done in the Lovingood matter. Exhibit D, Deposition of Tommy Jones, p. 22, lines 1-9. Again, without any explanation or justification as to why Defendants Johnson and Graves were not the subject of at least discipline and/or retraining on the proper use of force when bringing a person with a mental health issue into the Jail, the County simply ignores what it knew was going on with the Monroe County deputies.

The cases identified thus far by the Plaintiff demonstrate that there was a "systemic failure to train" deputies adequately and that systemic failure constitutes a policy or custom which establishes liability for the County. *Gregory v. City of Louisville*, 444 F.3d 725, 753 (6th Cir. 2006). The lack of training and supervision was glaringly apparent prior to the encounter with the Plaintiff, and the training and supervision was so woefully inadequate that Monroe County had already had multiple complaints and been sued over the unconstitutional use of force by its deputies. Under such circumstances the failure to train is tantamount to deliberate indifference as to whether or not the deputies and jailers in Monroe County engage in constitutional violations of the rights of inmates and persons being arrested. *Connick v. Thompson*, 563 U.S. 51 (2011) At some point, Monroe County has to stop claiming that they know nothing notwithstanding that the constitutional violations as to the excessive use of force is right in front of them, and they need to start correcting the problem.

The Sixth Circuit has held that where there is an official who is a policy maker for the County who has ratified the unconstitutional conduct of the officers who have committed the unconstitutional acts by failing to train and/or failing to investigate complaints of unconstitutional conduct, those actions, or failures to act, may give rise to "municipal liability" on behalf of the County. *Marchese v. Lucas*, 758 F.2d 181, 187-189 (6th Cir. 1985) (A sheriff sued in his official capacity had "a duty to both know and act"). In the case before this Court, the then-Sheriff Bivens was a policy maker and did not investigate the allegations of wrongdoing by Defendants Graves and Johnson even though there was videotape surveillance showing what the deputies did to Plaintiff; Plaintiff's mother had complained directly to Sheriff Bivens about the treatment of her son (Exhibit D, Deposition of Tommy Jones, p. 37, lines 20-24); and Bivens did not subject the

offending deputies to any discipline or retraining. Exhibit G, Deposition of Johnson, p. 68, lines 7-12; Exhibit D, Deposition of Tommy Jones, p. 8, lines 12-25; p. 22, lines 2-9; Exhibit I, Deposition of Graves, p. 74, lines 7-24. In short: Bivens ratified their unconstitutional use of force against Plaintiff and in so doing, has subjected Monroe County to liability.

The policy or custom of allowing deputies to come into the Jail and subject inmates to gratuitous violence and excessive force, and failing to investigate/discipline those deputies created an unconstitutional policy that was the link to the violence visited upon Plaintiff in this case. The fact that the deputies involved knew there were cameras in the Jail and yet still engaged in this unconstitutional use of force is strong circumstantial evidence that they were secure in the belief that there would be no repercussions for their conduct. That belief can only come from their knowledge that in the past, similar actions have not resulted in discipline within the Sheriff's Department and apparently deputies have only been fired when the prosecuting attorney's office has filed criminal charges. *Bennett v. City of Eastpointe*, 410 F.3d 810, 819 (6th Cir. 2005); *King v City of Eastpointe*, 86 F. App'x 790, 801 (6th Cir. 2003) See Exhibit I, Deposition of Graves, p. 36, lines 16-25, p. 37, lines 1-25, p. 38, lines 2-8, pps. 41-42, lines 21-25, 1-22.

At some point a Court must acknowledge that Monroe County's action in turning a blind eye to the repeated evidence of abuse of force by deputies against citizens/detainees/arrestees and inmates has crossed the line into a policy or custom of permitting "tune-ups" and other similar conduct by deputies in instances where the deputies have lost their temper with a person under their control. Based on the prior instances, which provided notice to the County and following which the County did

nothing to curb the behavior, this Plaintiff presents the Court with the opportunity to tell Monroe County "it stops here, and it stops now."

## II.     FAILURE TO PROPERLY SCREEN AT HIRING

The Defendant has withheld documents that Plaintiff's counsel requested. Another request for those documents has been made without any production even while Defendant attempts to support its Motion for Summary Judgment with an Affidavit from Randy White referencing certain documents Plaintiff has never seen despite having requested them. See Exhibit D, Deposition of Tommy Jones, p. 17-18, p. 18-25, 1-18; p. 24, lines 6-22; p. 28, lines 8-17.

Even without those records, Plaintiff has identified at least five other instances of excessive force by deputies against citizens, detainees, and/or inmates at the Monroe County Jail. See Exhibit F, Request for Judicial Notice. Plaintiff is attempting to locate those persons and obtain affidavits or declarations from them.

However, the testimony of Defendant Johnson reveals that he has been with multiple law enforcement agencies, but there is no explanation for his job-hopping. Exhibit G, Deposition of Johnson, pps. 7-8 lines 22-25, 1-25. Such a checkered work history raises a question about whether or not he was fired, or was asked to resign.

Defendant Graves has testified that he was never required to submit to a physical fitness examination, and could not recall undergoing a psychological examination in conjunction with being hired by the Monroe County Sheriff's Department. See Exhibit I, Deposition of Derrick Graves, p. 31, lines 1-18. This is a direct violation of T.C.A. § 38-8-106 and § 8-8-102 which requires that an applicant be examined and certified as being free from any disorder set forth in the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association that would impair the applicant's

ability to perform the job or the job would cause the applicant to pose a direct threat to the public safety. Given the number of instances involving the blatant use of excessive force and gratuitous violence on persons arrested/confined at the Monroe County Jail, and the failure of the County to turn over the personnel files of deputies/jailers requested by Plaintiff, one must draw the conclusion that Monroe County has for years permitted the Sheriff's Department to hire and retain persons who have not met the requirements of T.C.A. § 38-8-106 and § 8-8-102. Such a failure would explain the repeated unconstitutional uses of force that have resulted in at least four (4) deputies being criminally charged for their assaults on inmates.

## CONCLUSION

The repeated instances of the unconstitutional use of force by the Monroe County Sheriff's deputies that have gone unchecked. As Plaintiff has demonstrated herein, there are ample instances of this conduct to have placed Monroe County on notice that closer supervision and/or retraining was required to prevent the conduct.

The testimony of Jones reveals that official documents from the Sheriff's Department have gone missing and both Graves and Johnson have testified that there was never any investigation into their conduct at the time it occurred, thereby establishing that Monroe County has ratified through the inaction of the then-decision maker, Sheriff Bivens, the unconstitutional use of force by Graves and Johnson. The testimony of Graves in his deposition aptly demonstrates that he personally was aware of the prior incident with Deputies Wilburn and Goodman, knew they were criminally charged over it and took a plea deal, and Wilburn was then rehired by Sheriff Bivens. It is no wonder that deputies in Monroe County feel free to engage in the use of excessive force and/or gratuitous violence without fear of any meaningful consequence.

The testimony by Graves in his deposition was that he was hired by the Monroe County Sheriff's Department even though he was never required to undergo a physical examination and cannot remember ever undergoing a psychological examination. Since the personnel files of Graves and Johnson were never produced to Plaintiff, this Court must draw the inference that their files would show that neither officer had the proper documentation in their file to qualify for their positions, and that other adverse information was contained therein.

Plaintiff respectfully submits to this Court that any summary judgment be denied.

**RESPECTFULLY SUBMITTED**, this the **18th** day of **December,** 2020.

**THE BOWLIN LAW FIRM P.C.**

BY: _____

Troy L. Bowlin, II
Attorney for Andrew Lovingood
First Tennessee Plaza
800 South Gay St. Suite 2131
Knoxville, TN 37929
Telephone: (865) 245-2011
troy@tblf-pc.com
www.thebowlinlawfirm.com

24

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing **Response and Incorporated Memorandum of Law to Defendant Monroe County, Tennessee's Motion for Summary Judgment** has been duly filed electronically. Notice of the filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

This the **18th** day of **December**, 2020.

**THE BOWLIN LAW FIRM P.C.**

BY: _____
Troy L. Bowlin, II
Attorney for Andrew Lovingood
First Tennessee Plaza
800 South Gay St. Suite 2131
Knoxville, TN 37929
Telephone: (865) 245-2011
troy@tblf-pc.com
www.thebowlinlawfirm.com